Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
Erin Hogan-Freemole, OSB # 212850
(503) 234-0788 │ erin@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

Nicholas S. Cady (OSB # 113463)
Tel:  541-434-1463
Email: nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER, CASCADIA WILDLANDS, OREGON WILD, and SODA MOUNTAIN WILDERNESS COUNCIL**, | Case No. |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | (Environmental Matters – Violations of Federal Land Policy and Management Act; National Environmental Policy Act; Administrative Procedure Act) |
| **UNITED STATES BUREAU OF LAND MANAGEMENT**, | |
| Defendant. | |

## NATURE OF ACTION

1.      Plaintiffs Klamath-Siskiyou Wildlands Center ("KS Wild"), Cascadia Wildlands, Oregon Wild, and Soda Mountain Wilderness Council ("SMWC") (collectively "Plaintiffs"), bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, to the final administrative action of the Bureau of Land Management, Medford District, Ashland Field Office ("BLM" or "Defendant"). In issuing the Lost Antelope Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Record ("DR") for the Lost Antelope Vegetation Management Project ("Project") in the Lost Antelope Project Area ("Project Area"), Defendant acted arbitrarily, capriciously, and contrary to the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. §§ 302 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h.

2.      The DR authorized a timber sale within the Lost Antelope Vegetation Management Project on BLM-administered lands located in the Little Butte Creek watershed in Jackson County northeast of Medford, Oregon. The DR is the first decision to implement timber sale activities contemplated in the Lost Antelope EA.

3.      This action seeks: 1) a declaration that the BLM violated FLPMA by authorizing a Project that is inconsistent with the applicable Resource Management Plan; 2) a declaration that the BLM violated NEPA and its implementing regulations by failing to take a hard look at, and adequately disclose and consider the projects effects on, fire risk and hazard and northern spotted owl habitat; and 3) the vacatur and remand of the Project to the BLM.

4.      The requested relief is necessary to preserve the status quo, to prevent illegal agency action, and to forestall irreparable injury to the environment.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

5.      Should Plaintiffs prevail, Plaintiffs will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims present a federal question. A present, actual, and justiciable controversy exists between the parties. The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201, and the requested injunctive relief is proper under 28 U.S.C. § 2202.

7.      Plaintiffs have exhausted their administrative remedies by timely participation throughout the agency's timber sale planning process. The challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendant has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Project area is located within this judicial district. Defendant maintains an office in this judicial district.

9.      This case is properly filed in the Medford Division pursuant to Local Rule 3-2 because the timber sale Project area, and Defendant's office where the decision was signed, are located in Jackson County. The events and omissions giving rise to this claim occurred and the property that is subject to this action is situated in the Medford Division.

## PARTIES

**Plaintiffs**

10.      Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild's main office is in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and Northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands and forests, and routinely participates in commenting, monitoring, and litigation affecting public lands in Oregon. KS Wild is a membership organization and has members who would be irreparably injured by implementation of the Lost Antelope DR and timber sale.

11.    Plaintiff CASCADIA WILDLANDS is an Oregon non-profit organization based in Eugene, Oregon. Representing over 12,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands' members use the Lost Antelope timber sale area for a variety of professional and personal pursuits including viewing threatened and endangered species and their habitat. Implementation of the Lost Antelope DR and timber sale would irreparably harm the interests of Cascadia Wildlands and its members.

12.    Plaintiff OREGON WILD is a non-profit corporation with approximately 7,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy. Oregon Wild members use the Lost Antelope Project area for hiking,

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—4

recreation, bird watching, nature appreciation, and other recreational and professional pursuits. Implementation of the Lost Antelope DR and timber sale would irreparably harm the interests of Oregon Wild and its members.

13.     Plaintiff SODA MOUNTAIN WILDERNESS COUNCIL ("SMWC") is a non-profit organization incorporated in Oregon and headquartered near Ashland, Oregon. SMWC has approximately 325 members and mails its newsletter to about ten times that many supporters, with most members and supporters concentrated in southern Oregon and northwestern California. SMWC is dedicated to protecting and restoring wildlands and preserving the outstanding biodiversity and biological connectivity of the botanically significant Siskiyou Mountains where they join the Cascade Range in southwest Oregon and northwest California. SMWC monitors federal public land activities to ensure that management complies with relevant federal laws, including environmental laws. SMWC also proposes designations that would better protect the area. SMWC has a specific interest in the lands in southwest Oregon managed by the BLM pursuant to the Oregon and California Revested Lands Sustained Yield Management Act ("O&C Act"), 43 U.S.C. § 2601; it monitors the Medford and Klamath Falls Resource Area BLM projects on O&C lands in near the Cascade-Siskiyou National Monument. SMWC educated the public and elected officials, wrote comments, and otherwise advocated for the designation of the Cascade-Siskiyou National Monument, which is directly adjacent to the Lost Antelope planning area.

14.     Plaintiffs have organizational interests in the proper and lawful management of the public lands managed by the Medford District BLM. Plaintiffs have actively participated in the Project's administrative process by reviewing BLM proposals and documents, conducting

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—5

field exams, and submitting timely written comments regarding proposed BLM management activities.

15.     Plaintiffs and their members, supporters, and staff would sustain injury to their aesthetic, educational, recreational, spiritual, and scientific interests if the Lost Antelope timber sale proceeds as authorized. Plaintiffs and their members, supporters, and staff have concrete plans to return to the area where the sale is located. Unless this Court grants the requested relief, Plaintiffs and their members, supporters, and staff will be adversely and irreparably harmed by the logging of old-growth forest stands located within Lost Antelope timber sale units.

**Defendant**

16.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is an agency within the United States Department of the Interior and is charged with managing public lands and resources in accordance and compliance with federal laws and regulations. It issued the Lost Antelope EA and associated FONSI and DR authorizing the Lost Antelope timber sale.

## LEGAL BACKGROUND

### Administrative Procedure Act (APA)

17.     The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

18.     Upon review under the APA, a court shall "hold unlawful and set aside agency action * * * found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

accordance with law * * *." 5 U.S.C. § 706(2). Furthermore, when an agency has acted without observance of the procedure required by law, that action will be set aside. 5 U.S.C. § 706(2)(D).

**Federal Land Policy and Management Act (FLPMA)**

19.     Congress enacted the Federal Land Policy and Management Act in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq.* Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). In FLPMA, Congress expressed its belief that our public lands should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource and archeological values." 43 U.S.C. § 1701(A)(8).

20.     FLPMA requires the BLM to develop land use plans called "resource management plans" ("RMPs") that govern the use of the land BLM manages. 43 U.S.C. § 1712. Once a resource management plan has been developed, the BLM is required to manage its lands in compliance with the plan and ensure that any site-specific projects conform to the RMP. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

21.     The BLM issued the Southwestern Oregon RMP for the Ashland Resource Area of the Medford BLM District in 2016. The final 2016 Southwestern Oregon RMP ("2016 RMP") applies to the Lost Antelope Project and the timber sale authorized by the DR.

22.     The 2016 RMP allocates varying amounts of land to six different land use categories, including late-successional reserves ("LSR"), riparian reserves, and the Harvest Land Base ("HLB"). The HLB land use allocation is managed for sustained-yield timber harvest, balanced with other applicable objectives and directives. The LSRs are managed to, *inter alia*, develop, maintain, and promote northern spotted owl nesting, roosting and foraging habitat.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—7

**National Environmental Policy Act (NEPA)**

23.     Congress enacted the National Environmental Policy Act to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and simulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

24.     To accomplish these purposes, NEPA and its implementing regulations set forth procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions, and (2) foster meaningful public participation.

25.     The Council on Environmental Quality ("CEQ") has promulgated uniform regulations to implement NEPA that are binding on all federal agencies, including the BLM. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq* (1978) ("1978 CEQ regulations"). During the Trump Administration, the CEQ regulations were modified ("2020 CEQ regulations").

26.     On his first day of office, President Biden issued Executive Order 13990: Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis.[1] It provides that the policy of the Biden Administration is to, *inter alia*, be guided by best available science, improve public health, and protect our environment. EO 13990 directs the heads of all federal agencies to immediately review all existing regulations, orders, guidance documents, policies, and any similar agency actions promulgated, issued, or adopted between January 20, 2017 and January 20, 2021 that are inconsistent with the policy statement.

---

[1] *Available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—8

27.    The Biden Administration provided a non-exclusive list of agency actions that the heads of relevant agencies will review in accordance with EO 13990. *See* Fact Sheet: List of Agency Actions for Review.[2] The 2020 CEQ regulations are the first item on President Biden's list.

28.    In response to EO 13990, the Secretary of the Interior issued Order ("SO") No. 3399: Department-Wide Approach to the Climate Crisis and Restoring Transparency and Integrity to the Decision-Making Process.[3] SO 3399 provides that "Bureaus/Offices will not apply the 2020 Rule in a manner that would change the application or level of NEPA that would have been applied to a proposed action before the 2020 Rule went into effect on September 14, 2020." Thus, the 1978 regulations apply to the Lost Antelope Project.

29.    NEPA requires all federal agencies to prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This detailed statement, known as the Environmental Impact Statement, or EIS, must describe the environmental impacts of the proposed action and alternatives to the proposed action. *Id.* An EIS must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. §§ 1508.11, 1502.1.

30.    NEPA further requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

---

[2] *Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/.
[3] *Available at* https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3399-508_0.pdf.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

31.     In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. § 1508.27. In evaluating intensity, federal agencies must consider numerous "significance" factors, including impacts that may be both beneficial and adverse; the degree to which the proposed action affects public health or safety; any unique characteristics of the geographic area such as proximity to historic or cultural resources, parks lands, prime farmlands, wetlands, wild and scenic rivers or ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; the degree to which the action may adversely affect an endangered or threated species or its habitat that has been determined to be critical under the Endangered Species Act of 1973; and whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. §§ 1508.27(b)(1)-(10).

32.     If an agency is unsure if a federal action will have a significant effect on the human environment, it must prepare an Environmental Assessment ("EA") to determine if an EIS is required. 40 C.F.R. § 1501.4.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

33.     After analyzing a proposed action, an agency may determine that it will have no significant impact on the environment and decide to implement it. For an agency's decision to be considered reasonable, a decision record and finding of no significant impact ("DR/FONSI") must be issued containing sufficient evidence and analysis to show the decision is reasonably supported by the facts. The agency must show a rational connection between the facts found and the decision rendered. If the agency fails to consider important aspects of the problem in its NEPA analysis, its decision is arbitrary and capricious.

34.     To support an agency determination of non-significance, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. § 1508.8. Direct effects are caused by the action and occur at the same time and place as the proposed project. 40 C.F.R. § 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distances but are still reasonably foreseeable. 40 C.F.R. § 1508.8(b). Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." 40 C.F.R. § 1508. Cumulative impact results when the "incremental impact of the action [is] added to other past, present, and reasonably foreseeable future actions" undertaken by any person or agency. 40 C.F.R. § 1508.7.

35.     NEPA requires that environmental information be available to public officials and citizens before agency decisions are made and before any actions occur to implement the proposed project. 40 C.F.R. § 1500.1(b). The information released must be of high quality and sufficient to allow the public to question the agency rationale and understand the agency's decision-making process. *Id.*

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—11

36.    40 C.F.R. § 1502.20 provides that "[a]gencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28)." A subsequent environmental assessment "shall concentrate on the issues specific to the subsequent action." *Id.*

37.    Courts view tiered analyses as a whole when determining whether they adequately address all impacts and may reject such environmental review where none of the documents address significant issues. Under NEPA, an agency cannot minimize an activity's environmental impact by adopting a broad scale analysis and marginalizing the activity's site-specific impact.

## FACTUAL AND ADMINISTRATIVE  BACKGROUND

### The Lost Antelope Project

38.    On or about October 16, 2020, the Ashland Field Office of the Medford District of the BLM published the scoping notice for the Lost Antelope Vegetative Management Project. The scoping notice described the Project as contemplating 1,300 acres of commercial timber harvest logging activities.

39.    The Lost Antelope project area is in southwest Oregon, located in the Wildland Urban Interface (WUI) zone for communities such as Lost Creek, and directly adjacent to the Cascade-Siskiyou National Monument, which was designated by President Clinton in 2000 and expanded by President Obama in 2017. The Cascade-Siskiyou National Monument contains important intact forest habitat and is the only National Monument designated to protect the outstanding biological diversity of the area.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

40.     The scoping notice described the project as being designed to achieve management direction relating to: 1) timber harvest in the Harvest Land Base; 2) hazardous fuels reduction; and 3) timber harvest in the Late Successional Reserve.

41.     On November 12, 2020, Plaintiffs submitted timely scoping comments on the Project. The scoping comments raised concerns about the effects of regeneration harvest on fire hazard, the impacts of logging on northern spotted owls and other resident species, and the need to conform to the 2016 RMP, among other concerns.

42.     On or about June 1, 2021, the Ashland Field Office of the Medford District of the BLM posted a notification letter and a version of the Lost Antelope Environmental Assessment to the BLM e-planning website, triggering a 30-day commenting period on the Lost Antelope EA. The initial posted version of the June 2021 EA included the BLM interdisciplinary team's tracked comments throughout the document.

43.     Within a few days BLM removed the previously posted version of the EA and posted a new version of the Lost Antelope EA without tracked comments. BLM did not initiate a new 30-day comment period.

44.     The EA described the purposes of the Project as including "manage activity fuels and natural hazardous fuels to modify the fuel profile… and reduce potential fire behavior and severity;" and, in LSRs, "limit … silviculture treatments… to those that do not preclude or delay by 20 years or more the development of northern spotted owl nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment."

45.     The EA described the needs for the Project as including "increase stand-level fire resistance and decrease stand-level fire hazard from current conditions" and "develop spotted owl nesting-roosting habitat in the LSR-Dry LUA."

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—13

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

46.    The Lost Antelope EA analyzed four alternatives, which included a "no action" alternative and three "action" alternatives with varying levels of timber harvest in different land allocations.

47.    Plaintiffs submitted timely comments on the Lost Antelope EA. In the comments, Plaintiffs raised concerns about the BLM's intent to log in Late Successional Reserves and to remove northern spotted owl habitat in the LSRs via that logging. Plaintiff raised concerns that the Forest Service intended to proceed with spotted owl habitat removal in LSRs despite its modeling showing that the proposed logging would delay the establishment of canopy cover necessary for development of spotted owl nesting and roosting habitat by more than two decades.

48.    Plaintiffs also raised concerns that forest canopy removal followed by establishment of artificial plantations will increase fire risk and hazard.

49.    On August 31, 2021, the Ashland Field Office of the Medford District of the BLM published a final Lost Antelope EA ("Final EA").

50.    The Final EA acknowledged that the proposed logging would increase fire hazard in "regeneration harvesting" logging units within and near the WUI in both the short term and long term but did not provide a site-specific, detailed analysis of this issue. Rather, the Final EA stated that the BLM had sufficiently analyzed fire risk and hazard in the programmatic EIS for the 2016 RMP, to which the Lost Antelope EA tiers.

51.    On August 31, 2021, BLM also published a Finding of No Significant Impact ("FONSI") and separate Decision Record ("DR"). The DR authorizes the Lost Antelope timber sale ("timber sale"), which provides for, *inter alia*, 476 acres of timber harvest, including 112 acres of regeneration harvest in the HLB, and 169 acres of selection harvest in LSR lands. These

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

476 acres of timber harvest will produce approximately 5.4 million board feet ("MMbf") of timber.

52.    The DR notes that the "other activities analyzed in the EA but not included in this decision, may be included under future decisions at a later date."

### Northern Spotted Owl Habitat and Late Successional Reserve Logging

53.    The northern spotted owl (*Strix occidentalis caurina*) is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks. The northern spotted owl occupies late-successional and old-growth forest habitat from southern British Columbia through Washington, Oregon, and California as far south as Marin County, including the Lost Antelope project area.

54.    Spotted owls rely on older forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. Forested stands with high canopy closure also provide thermal cover as well as protection from predation. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat.

55.    Due to concerns over widespread habitat loss and modification as well as the lack of regulatory mechanisms to protect the species, the United States Fish and Wildlife Service ("FWS") listed the northern spotted owl as "threatened" under the Endangered Species Act on June 26, 1990. 16 U.S.C. § 1533(a); *Determination of Threatened Status for the Northern Spotted* Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (*codified at* 50 C.F.R. § 17.11(h)).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

56.     Critical habitat was designated for the species in 1992 and revised in 2008.

*Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the*

*Northern Spotted Owl; Final Rule*, 73 Fed. Reg. 47,325 (Aug. 13, 2008). A draft revised

northern spotted owl critical habitat rule was published on March 8, 2012 and finalized on

December 4, 2012. *Endangered and Threatened Wildlife and Plants; Revised Critical Habitat*

*for the Northern Spotted Owl: Final Rule*, 77 Fed. Reg. 71,876 (December 4, 2012).

57.     The 2012 critical habitat rule states that "primary constituent elements" of

northern spotted owl critical nesting and roosting habitat

> typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered,
> multispecies canopy with large (greater than 30 in (76 cm) dbh) overstory trees; a high
> incidence of large trees with various deformities (e.g., large cavities, broken tops,
> mistletoe infections, and other evidence of decadence); large snags; large accumulations
> of fallen trees and other woody debris on the ground; and sufficient open space below the
> canopy for northern spotted owls to fly.

77 Fed. Reg. 71,905.

58.     The Medford District of the BLM is within the range of the northern spotted owl.

The 2016 RMP designated areas within the Medford District as LSR and those areas are

governed by the RMP.

59.     Per the RMP, LSRs are managed to develop, maintain, and promote northern

spotted owl nesting, roosting and foraging habitat.

60.     The RMP prohibits logging in LSRs that precludes or delays by 20 years or more

the development of northern spotted owl nesting-roosting habitat in the stand and in adjacent

stands, as compared to development without treatment. Rather, the RMP directs treatments in

these habitat reserves "to speed the development of northern spotted owl nesting-roosting habitat

or improve the quality of northern spotted owl nesting-roosting habitat in the stand or in the

adjacent stand in the long term."

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—16

61.     In Southern Oregon, northern spotted owl nesting and roosting habitat consists of conifer stands with a multi-layered, multi-species canopy dominated by larger conifer overstory trees, canopy cover ≥ 60 percent, overstory tree diameter of ≥ 21" diameter at breast height (dbh), > 12 trees with 20" or greater dbh trees/acre, quadratic mean diameter ("QMD") > 15" dbh, basal area from 180 to 240 ft$^3$/acre (most often greater than 240 ft$^3$/acre), and a basal area from larger trees of > 30ft$^3$ for trees > 26" dbh.

62.     60 percent canopy cover is the "minimum canopy cover requirement" for NRF habitat.

63.     The Lost Antelope EA analyzed the impacts of proposed logging in LSRs, including up to 623 acres for some alternatives.

64.     Ultimately, the initial Lost Antelope DR authorized logging in 169 acres of LSR while future decisions could authorize additional logging that was contemplated in the Lost Antelope EA.

65.     In its analysis of how proposed logging treatments would affect forest conditions and spotted owl nesting/roosting habitat in the long term, BLM modeled only three of fifteen proposed logging units that are located in LSRs. BLM used the Forest Vegetation Simulator model.

66.     BLM's model demonstrated that the proposed logging within LSR logging units will not speed the development of or increase the quality of spotted owl nesting and roosting habitat in the long term, but rather delay the establishment of nesting and roosting habitat by more than 20 years.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

67.     BLM subsequently ignored the results of its own model and relied on an unsupported assumption that canopy cover will fortuitously exceed the results predicted by the agency's own data model.

68.     BLM admitted that the model is inaccurate because the results are "skewed" but then concluded that the RMP requirement was met despite the model's results.

69.     The Lost Antelope DR ultimately authorized downgrading and removal of old-growth forest stands within the Project's LSR land use allocation despite the BLM's own data and model illustrating that such an approach will in fact delay the establishment of nesting and roosting habitat conditions by more than 20 years contrary to the applicable RMP standard.

**Fire Risk and Logging in the Wildland Urban Interface**

70.     In the EA, BLM identified reducing fire hazard as a purpose and need of the project, and the effect of commercial harvest treatments on fire hazard as an issue to be analyzed "in detail." "Fire hazard" reflects an area's fuel volume, type, condition, arrangement, and location, which determine the ease of ignition and resistance to control once ignited.

71.     The 2016 RMP requires the BLM to conduct logging activities in the Harvest Land Base (HLB) "to enhance timber values and to reduce fire risks." "Fire risk" describes the likelihood, susceptibility, and intensity for wildfire and adverse effects to human values (e.g., life, property, and ecological functions and resources). Fire hazard is thus one component of fire risk.

72.     Logging techniques to be employed in the Lost Antelope timber sale include commercial thinning and "regeneration harvest," known colloquially as "clear cutting" because nearly all the trees are cleared from the harvest area. Similarly, "group selection" logging areas

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

within Lost Antelope timber sale units will removal all or most of the trees within the "selection" areas.

73.    The DR authorizes 131 acres of clearcutting and regeneration, much of it in the Wildland Urban Interface ("WUI") and near areas with rural residential development, ranches, farms, homes and communities. The WUI is the area where structures and other human development meet or intermingle with undeveloped wildland.

74.    The artificial "regeneration" of a second-growth timber crop after the mature forest canopy has been removed results in dense stands of small, homogenously-aged trees. Management practices such as logging and even-aged regeneration planting have resulted in overly dense forest stands and a reduction of large fire-resistant trees throughout the Lost Antelope project area and across southern Oregon. These conditions have led to increased fire hazard, while the continued expansion of the WUI has increased the values at risk from wildfire.

75.    The practice of converting native forest stands into early seral stands or plantations significantly increases fire hazard in the mid- to long-term. Tree plantations are more susceptible to intense fire behavior and severe fire effects than unlogged mature forests, including burned forests.

76.    Commercial logging operations also increase fire danger in the immediate and short term. "Residual activity fuels" associated with timber management – otherwise known as "logging slash" – have the potential to increase fire hazard.

77.    The BLM has concluded that immediately following commercial harvest residual activity fuels left on the forest floor will increase surface fuel loadings and have the potential to increase surface fire behavior, posing a risk to the residual stand and other values, if not adequately treated. The risk these activity fuels pose increases near human values.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—19

78.     Regeneration harvesting and group selection logging followed by the establishment of stand initiation and early seral forests will increase current and future fire hazard in the Lost Antelope planning area. Because of the Project's proximity to ranches, homes and structures, this increased fire hazard will increase fire risk to the BLM's neighbors.

79.     Much of the Project area is in the WUI, where the proximity to human habitation and development can complicate fire management and limit the available options for fuels treatments.

80.     More specifically, the Lost Antelope planning area encompasses homes, ranches, farms and other rural residential and human structures. Project activities will occur ten miles from the city of Medford.

81.     The Project's proximity to development and valued resources poses a heightened fire risk due to the increased fire hazard the BLM anticipates the Project to cause.

82.     The BLM describes fire risk with reference to four fire hazard categories: low, moderate, high, and mixed. The "mixed" category indicates the potential to exhibit the full range of hazard categories and fire behaviors, from low to high. The BLM assigned the Project area a "mixed" rating based on forest age rather than site-specific observations of fuel conditions.

83.     The BLM's analysis indicates that the proposed logging operations will increase fire hazard at the stand level in the immediate, short, and long term in regeneration units and will maintain a similar level of hazard in selection harvest units.

///

///

///

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—20

|  | Existing Stand-Level Fire Hazard | Post-Logging Short-Term Fire Hazard | Post-Logging Intermediate Fire Hazard | Post-Logging Long-Term Fire Hazard |
|---|---|---|---|---|
| Regeneration Harvest (112 acres) | Mixed | Moderate | Moderate → High | High |
| Selection Harvest (364 acres) | Mixed | Moderate | Moderate → Mixed | Mixed |

84.     The transition from "mixed" to "moderate" is a not a reduction in fire hazard or risk, nor is the opposite (moderate to mixed) a reduction.

85.     The proposed logging activities will immediately increase fire hazard at the stand level.

86.     Logging creates flammable slash fuels, which increase fire hazard unless treated through scattering and prescription burning, piling and burning, or removal.

87.     The EA and DR fail to require any specific treatment or disposal of the post-logging slash and fail to address the effects of these fuels on increased fire hazard and fire risk near communities and residential areas.

88.     Plaintiffs raised these concerns to the BLM in their comments on the draft EA. Specifically, Plaintiffs expressed their concern that regeneration logging would increase fire hazard and put nearby homes and communities at greater fire risk. Plaintiffs urged the BLM to thoroughly evaluate this hazard, pointing to current science on logging and fire risk.

89.     In the final EA, DR and FONSI, BLM did not adequately disclose and consider the effects of the proposed project activities on stand level fire hazard and the change in fire risk to nearby communities and residences from the Lost Antelope timber sale, instead relying on the 2016 RMP FEIS and the analysis therein.

90.     The RMP FEIS does not include site-specific or project-specific analysis of fire hazard or risk resulting from the logging proposed in the Project.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—21

91.     The RMP FEIS specifically described the variability of appropriate fuels and fire management in WUI areas, where the mix of different land uses and jurisdictions increases the inherent complexities of fuel reduction efforts and fire management.

92.     Upon information and belief, the BLM did not prepare or disclose a fuels report explaining what it will do with slash piles and other activity-generated fuels. The EA states that "a variety of follow-up treatments (e.g., prescribed fire, biomass removal, and mechanical manipulation, etc.)" could reduce activity fuels and that these methods are analyzed in the RMP FEIS.

93.     The RMP FEIS section to which the EA tiers states that many different treatments can accomplish surface fuel reduction, including prescribed fire, biomass removal, and mechanical mastication or manipulation. It does not discuss these treatments in greater detail or explain where each might be appropriate. It notes that factors affecting the need and ability to mitigate fuel loading – including stand structure, yarding method, unit size, topographic position, soil composition, proximity to roads and developments, risk, treatment type and amount of remaining fuel, and acceptable levels of tree mortality – could not accurately be forecast or modeled at the programmatic scale.

94.     The EA does not identify these factors or analyze them or state which fuel treatments will be used and what the environmental impact of those treatments could be.

95.     The EA states that a fuels specialist will perform this analysis after the Project has been completed.

96.     The EA does not identify the values at risk or disclose the impact of the increase in fire hazard and risk on nearby communities or neighboring landowners.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

97.    Plaintiffs have exhausted their required administrative participation with respect to the Lost Antelope timber sale.

### FIRST CLAIM FOR RELIEF
### (FLPMA and APA Compliance)

98.    Plaintiffs reallege and incorporate all preceding paragraphs herein by reference.

99.    Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1732(a) and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM has a duty to ensure that a site-specific project conforms to the governing Resource Management Plan. The Lost Antelope Project is governed by the 2016 RMP.

100.    As set forth below, BLM has failed to demonstrate that the Lost Antelope EA, DR, and FONSI are consistent with the 2016 RMP, and therefore BLM's decision is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2).

**Count 1: The EA, Decision and FONSI are inconsistent with the RMP requirements governing logging in LSR.**

101.    Under the 2016 RMP, logging within the LSR that would delay the establishment of spotted owl nesting and roosting habitat by more than 20 years is precluded. The 2016 RMP specifically directs treatments "to speed the development of northern spotted owl nesting-roosting habitat or improve the quality of northern spotted owl nesting-roosting habitat in the stand or in the adjacent stand in the long term."

102.    The EA and DR authorize logging activities within the LSR despite the EA disclosing outputs from a model demonstrating that proposed logging will delay the establishment of nesting and roosting habitat conditions by more than 20 years.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—23

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

103.    The analysis within the Lost Antelope EA, which the DR relies upon, shows that the Lost Antelope treatments will not "speed" development of nesting and roosting habitat in the LSR.

104.    The BLM's decision to approve logging treatments that are inconsistent with RMP requirements violates FLMPA and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 2: Failure to explain and ensure consistency with the RMP directive regarding reducing fire risk in the HLB.**

105.    The 2016 RMP directs the BLM to conduct logging activities in the HLB "to reduce fire risks."

106.    The logging activities approved in the EA, FONSI and DR will not reduce fire risk, but will instead increase it in both the short and long term.

107.    The BLM has failed to make a rational determination that the Project's logging operations, including regeneration treatments in the WUI, are consistent with the RMP.

108.    The BLM's failure to explain how the Project is consistent with the RMP directive regarding fire risk violates FLPMA and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**
**(NEPA and APA Compliance)**

109.    Plaintiffs reallege and incorporate all preceding paragraphs herein by reference.

110.    NEPA and its implementing regulations require federal agencies to take a hard look at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. *See* 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1502, 1508.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

111.    An EA must provide sufficient information for determining whether to prepare an EIS or issue a Finding of No Significant Impact. 40 C.F.R. § 1508.9(a). The information presented in the EA must be of "high quality," and include "accurate scientific analysis." 40 C.F.R. § 1500.1(b). The agency must adequately explain its decision not to prepare an EIS by supplying a convincing statement of reasons why potential effects are insignificant.

112.    NEPA requires that an adequate EA analyze "direct effects," which are caused by the action and occur at the same time and place," as well as "indirect effects which … are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8.

**<u>Count 1</u>: Failure to take a hard look at impacts to spotted owl habitat in the long term.**

113.    BLM has violated NEPA and its implementing regulations through issuance of the Lost Antelope EA, FONSI, and DR, which fail to take the requisite hard look at the Project's impacts to nesting and roosting habitat in the long term.

114.    In particular, the BLM's reliance on an admittedly inaccurate model of forest stand development, and then its conclusion regarding habitat that is directly contrary to that model's output, and otherwise entirely unsupported, are inadequate under NEPA.

115.    The BLM failed to articulate a rational connection between the facts found and the decision made, failed to consider important aspects of the problem, offered explanations that run counter to the available evidence, and failed to observe the procedures required by law.

116.    The BLM's failure to adequately consider the direct and indirect effects on northern spotted owl habitat is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A).

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—25

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**Count 2**: Failure to adequately disclose and consider the Project's impacts on fire risk and hazard.

117.    BLM failed to take a hard look at the Project's direct, indirect, and cumulative impacts and environmental consequences. Specifically, BLM failed to adequately disclose and consider the increase in fire hazard and risk associated with the proposed activities, and the effect of this increase on nearby communities and residences.

118.    Tiering to the 2016 RMP was insufficient to meet the BLM's NEPA obligations with respect to this issue, as the RMP FEIS contains no site-specific analysis of fuels, fire hazard, or fire risk.

119.    The BLM also failed to consider and disclose which post-logging fuels treatments would occur as part of the Project and the effects of these fuel treatments.

120.    The Forest Service failed to articulate a rational connection between the facts found and the decision made, failed to consider important aspects of the problem, offered explanations that run counter to the available evidence, and failed to observe the procedures required by law. Its decision was therefore arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A).

121.    As such, the BLM's decision is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following relief:

A.    Declare the Lost Antelope Environmental Assessment and associated Decision Record and Finding of No Significant Impact violate FLMPA and its implementing regulations because they are inconsistent with the applicable RMP;

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—26

B.      Declare that the BLM violated NEPA and its implementing regulations by authorizing the Lost Antelope Environmental Assessment and associated Decision Record and Finding of No Significant Impact without satisfying its legal obligations to take a hard look at the impacts of the Lost Antelope Project.

C.      Declare that the issuance of the Lost Antelope Environmental Assessment and associated Decision Record and Finding of No Significant Impact is arbitrary, capricious, and abuse of agency discretion, and contrary to law, in violation of Section 706(2)(A) of the APA;

D.      Vacate and set aside the Lost Antelope Environmental Assessment and associated Decision Record and Finding of No Significant Impact and remand the Lost Antelope Environmental Assessment and associated Decision Record and Finding of No Significant Impact to the BLM until such time as the BLM demonstrates to this Court that it has adequately complied with the law;

E.      Enjoin the BLM and its contractors, assigns, etc. from implementation of the Lost Antelope Environmental Assessment and associated Decision Record, Finding of No Significant Impact, and timber sale;

F.      Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act and/or other applicable statutes; and

G.      Grant Plaintiffs such additional relief as this Court deems just and proper.

DATED this 11th day of November 2021.

///

///

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—27

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Respectfully submitted,

s/ Meriel L. Darzen
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
Erin Hogan-Freemole, OSB # 212850
(503) 234-0788 │ erin@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

Nicholas S. Cady (OSB # 113463)
Tel: 541-434-1463
Email: nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440

*Attorneys for all Plaintiffs*